# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-IA-01253-SCT

*JAMES L. PETTIS, III*

*v.*

*JOHN KARSTEN SIMRALL*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/19/2021 |
| TRIAL JUDGE: | HON. VICKI R. BARNES |
| TRIAL COURT ATTORNEYS: | J. LAWSON HESTER |
| | PENNY B. LAWSON |
| | JASON E. DARE |
| | EUGENE A. PERRIER |
| | TRAVIS T. VANCE, JR. |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JASON E. DARE |
| | ROBERT A. BIGGS, III |
| ATTORNEY FOR APPELLEE: | TRAVIS T. VANCE, JR. |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | REVERSED, RENDERED AND REMANDED - 01/19/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE KING, P.J., CHAMBERLIN AND ISHEE, JJ.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.     This case presents an issue of first impression: whether an attorney's representation of a general partnership creates an implied attorney-client relationship between the attorney and the individual members of the general partnership, and, if so, whether the Mississippi Rule of Professional Conduct prohibiting communication by a lawyer with an individual represented by other legal counsel was violated. James L. Pettis, III, attorney for the plaintiff,

appeals an order of the chancery court disqualifying him for a violation of Mississippi Rule of Professional Conduct 4.2, which prohibits a lawyer from communicating with a person they know to be represented about the subject of the representation. After a careful review of the law, this Court reverses the chancery court's order, renders a judgment in favor of Pettis, and remands for further proceedings.

## FACTS AND PROCEDURAL HISTORY

¶2.     Newell Simrall, IV ("Newell"), John Karsten Simrall ("Karsten") and Catherine Rea Leist n/k/a Catherine Rea Ray ("Rea") are siblings and shareholders in the closely held Mississippi corporation B.N. Simrall & Son, Inc. ("the Corporation"). On April 1, 2010, Karsten and Rea, along with Dorman Dewayne Leist, entered into an amended partnership agreement for the general partnership Simrall & Simrall ("the Partnership"). In December of 2012, Newell, represented by J. Lawson Hester ("Hester"), filed a lawsuit ("the underlying litigation") in the chancery court of Warren County, naming as defendants Karsten, the Corporation, the Partnership, and several other entities connected to Karsten.[1] Penny Lawson ("Lawson") represented all named defendants in the underlying litigation.

¶3.     James L. Pettis, III ("Pettis"), was the law partner of Hester and had represented Newell in various matters over the years. In 2011, prior to the commencement of the underlying litigation, Pettis represented Newell in the negotiation of a stock purchase and

[1]The other named defendants were B.N. Simrall, III, Irrevocable Trust; Ballground, LLC; Ballground Plantation 1, LP; and John Does 1 through 10. According to Newell's complaint, Karsten held a majority share in the Corporation, was the principal beneficiary of the B.N. Simrall, III, Irrevocable Trust, was a partner of the Partnership, was a member of Ballground, LLC, and was a partner in Ballground Plantation 1, LP.

2

land-transfer agreement ("the Agreement") with Karsten. The alleged breach of the Agreement formed part of the basis for the underlying litigation. Although Pettis was involved in the negotiation of the Agreement, he was not retained to represent, nor did he enter an appearance on behalf of Newell in the underlying litigation.

¶4. On January 1, 2017, Rea withdrew from the Partnership while the litigation was pending. The Partnership was one of the named defendants in the underlying litigation filed by Newell in 2012, although Rea was not personally named as a defendant. In anticipation of the upcoming trial of the underlying litigation, Lawson met with Rea for several hours on March 20, 2019, to review checks signed by Rea on behalf of the Partnership.

¶5. Sometime in 2019, two years after Rea had disassociated from the Partnership, Rea became aware that Karsten was attempting to sell land belonging to the Corporation. At Newell's request, Rea and Newell met with Pettis on April 8, 2019, in his office to discuss the attempted sale. On April 11, 2019, Rea spoke with Lawson via telephone and informed her that she had met with Pettis. Pettis met Rea a second time when he attended the meeting of the shareholders and board of directors of the Corporation at Rea's home on April 15, 2019. At both meetings with Rea, Pettis asked whether she was represented by Lawson or any other attorney in the underlying litigation. Rea responded on both occasions that she was not represented by anyone, nor did she wish to seek representation in connection with the underlying litigation. Both Rea and Pettis submitted affidavits stating they only discussed how to prevent the sale of the Corporation's land by Karsten and that Rea was not represented by counsel in connection with the underlying litigation.

3

¶6. Prior to meeting with Rea, on March 15, 2019, Pettis sent a letter to Lawson, as Karsten's legal representative, informing her that a special meeting of the board and shareholders was being called and requesting information regarding Karsten's attempt to sell corporate land. Lawson did not respond to the letter, and neither Lawson nor Karsten attended the meeting at Rea's home on April 15, 2019. After the April 15 meeting took place, Pettis brought a copy of the meeting minutes to Lawson's office. When Pettis delivered the minutes to Lawson, she informed him that she represented Rea and that Pettis should not have met with Rea without counsel present.

¶7. The trial for the underlying litigation was set for April 30, 2019. On April 16, 2019, Lawson, as the legal representative of Karsten and all named defendants in the underlying litigation, filed a Motion to Disqualify Counsel for the plaintiff for a violation of Rule 4.2 of the Mississippi Rules of Professional Conduct and a Motion to Withdraw as Counsel for the defendants for a perceived conflict of interest between the named defendants and Rea. On April 29, 2019, Newell filed a response to both motions. The chancery court entered an agreed order granting Lawson's motion to withdraw on September 11, 2019.

¶8. The chancery court held a hearing on the motion to disqualify on September 11, 2019, November 30, 2020, and December 1, 2020.[2] On October 19, 2021,[3] the chancellor entered a judgment disqualifying both Pettis and Hester as counsel for the plaintiff. Specifically, the

---

[2]The single hearing spanned several days due to scheduling conflicts.

[3]It is unclear from the record as to why there was a more than ten month delay between the hearing and the issuance of the court's judgment disqualifying Pettis and Hester.

4

chancellor found that Rea "was a partner [of the Partnership] when Plaintiff's complaint was filed in 2012[,] . . . that Penny Lawson represented the general partnership and its individual members," and "that when [Pettis] was a law partner of [Hester], he violated the Rules of Mississippi Professional Conduct by conducting meetings with [Rea], a represented person." Following this judgment, Pettis filed a motion for reconsideration on October 29, 2021, which was denied on November 22, 2021. While his motion for reconsideration was still pending, Pettis timely filed a petition for writ of prohibition with this Court. On December 14, 2021, this Court granted Pettis's petition and ordered that it be treated as a petition for an interlocutory appeal pursuant to Rule 21(d) of the Mississippi Rules of Appellate Procedure.

**ISSUES PRESENTED**

¶9.    Pettis raises the following issues in his petition:

   I.    Whether the chancery court's disqualification of Pettis pursuant to Mississippi Rule of Professional Conduct 4.2 was improper.

   II.    Whether the chancery court had the authority and/or jurisdiction to disqualify Pettis.

**STANDARD OF REVIEW**

¶10.    "Little case law exists in Mississippi with regard to the standard of review of a trial court's decision of a motion to disqualify an attorney." *Newsome v. Shoemake*, 234 So. 3d 1215, 1227 (Miss. 2017) (internal quotation marks omitted) (quoting *Byrd v. Bowie*, 933 So. 2d 899, 906 (Miss. 2006)). This Court adopts the approach of the United States Court of Appeals for the Fifth Circuit that when reviewing the grant or denial of a motion to disqualify

counsel, "[t]he proper standard of review. . . is an abuse of discretion standard." ***Fed. Deposit Ins. Corp. v. U.S. Fire Ins. Co.***, 50 F.3d 1304, 1311 (5th Cir. 1995); *see also* ***State ex rel. Cannizzaro v. First Jud. Dist. Ct.***, 466 P.3d 529, 531 (Nev. 2020) (applying the Fifth Circuit's standard of review for attorney disqualification (citing ***In re Dresser Indus., Inc.***, 972 F.2d 540, 543 (5th Cir. 1992))). As always, the manifest error standard applies to appellate review of a chancellor's findings of fact. ***Newsome***, 234 So. 3d 1215 at 1217. (quoting ***Williams v. Bell***, 793 So. 2d 609, 611 (Miss. 2001)). Review of conclusions of law, however, is de novo. ***Shope v. Winkelmann***, 328 So. 3d 641, 643 (Miss. 2021) (quoting ***Belmont Holding, LLC v. Davis Monuments, LLC***, 253 So. 3d 323, 326 (Miss. 2018)).

## DISCUSSION

I.      **The chancery court's disqualification of Pettis pursuant to Mississippi Rule of Professional Conduct 4.2 was improper.**

¶11.    Rule 4.2 of the Mississippi Rules of Professional Conduct reads as follows: "In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." The chancery court found "that Penny Lawson represented the general partnership and its individual members" and that Pettis "violated the Rules of Mississippi Professional Conduct by conducting meetings with [Rea], a represented person." Based on these findings, the court ordered that "[Pettis] and [Hester] should be disqualified as counsel for Newell Simrall, IV."[4]

---

[4]Pettis argues in his brief that the order of the court was overly broad and could be read as a disqualification from representing Newell in the present case and at any point in the future. Given the context of the order, however, it is clear the disqualification was

¶12. Pettis argues that the disqualification was improper because 1) no attorney-client relationship existed between Lawson and Rea, 2) presuming such a relationship did exist, Pettis did not violate Rule 4.2 of the Mississippi Rules of Professional Conduct, and 3) Pettis's fundamental right to counsel of choice outweighs the appearance of impropriety.

¶13. Karsten argues that Pettis was fully aware of the alleged attorney-client relationship between Lawson and Rea due to his involvement as Hester's law partner. Karsten submits that an actual attorney-client relationship between Lawson and Rea exists and is apparent from evidence of prior representation in other matters and the fact that Rea was a partner in the general partnership of Simrall & Simrall. He argues that by virtue of the nature of a general partnership and the language of the amended partnership agreement, Rea will be personally liable to Newell if Newell receives a favorable judgment in the underlying litigation against the Partnership. Furthermore, he alleges that Pettis's actions resulted in the appearance of impropriety, which should be guarded against at every level of the judiciary to protect the integrity of the legal profession. We hold that the chancery court erred by finding an attorney-client relationship existed between Lawson and Rea. Additionally, presuming such a relationship did exist, there was no evidence of knowledge or discussion of illicit subject matter which would provide the grounds for Pettis's disqualification.

### A. No actual attorney-client relationship was formed between Lawson and Rea.

¶14. According to this Court, a relationship between a lawyer and a client arises when:

---

limited to representation in connection with the underlying litigation and was not indefinite in scope.

7

(1) a *person manifests to a lawyer the person's intent* that the lawyer provide legal services for the person; *and* either:

(a) the *lawyer manifests to the person the consent to do so*; or

(b) the lawyer fails to manifest lack of consent to do so, and the lawyer reasonably knows or should know that the person reasonably relies on the lawyer to [provide] services . . . .

*Gibson v. Williams, Williams & Montgomery, P.A.*, 186 So. 3d 836, 848 (Miss. 2016) (first alteration in original) (emphasis added) (citing *Singleton v. Stegall*, 580 So. 2d 1242, 1244 n.2 (Miss. 1991)). There was no written or oral agreement between Lawson and Rea indicating that Lawson represented her in the underlying litigation. Rea signed a sworn affidavit stating that she had not retained Lawson or any other attorney to represent her in the underlying litigation.

¶15. Karsten argues that the trial preparation Lawson engaged in with Rea and her former representation in other matters indicates the existence of an actual agreement between Lawson and Rea. Neither of these events demonstrate that an actual agreement existed, under these facts, for representation. Lawson prepared Rea for the trial of the underlying litigation because she signed most of the checks for the Partnership in her capacity as a partner. Lawson also represented Rea, the Partnership, and Karsten in a previous case, *Simrall v. Bunge-Ergon Vicksburg LLC*, 179 So. 3d 92 (Miss. Ct. App. 2015). Notably, Rea was personally named as a defendant in the lawsuit by Bunge-Ergon and Lawson entered an appearance on her behalf as an individual. The present case lacks any similar evidence of an actual agreement between Lawson and Rea. As *Gibson* states, the attorney-client relationship is based on the purported client's manifestation of an intent that they be represented. *Gibson*,

8

186 So. 3d at 848 (citing *Singleton*, 580 So. 2d at 1244 n.2). Rea clearly manifested an intent not to have representation in the underlying litigation. Therefore, no actual attorney-client relationship arose.

### B. No implied attorney-client relationship was formed between Lawson and Rea.

¶16. Without an actual agreement, Karsten and the chancery court relied on the proposition that, by virtue of Rea's involvement as a partner in the Partnership and Lawson's representation of the Partnership, Rea was represented by Lawson in the underlying litigation. Karsten argues that by naming the Partnership in his lawsuit, Newell impliedly named Rea as well, since as a general partner she could be jointly and severally liable for any judgment against the Partnership. Mississippi Code Section 79-13-306(a) states that "except as otherwise provided in subsections (b) and (c), all partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law." Miss. Code Ann. § 79-13-306(a) (Rev. 2013). Karsten relies on this code section and *Duggins v. Guardianship of Washington ex rel. Huntley* to substantiate the assertion that should Newell receive a judgment against the Partnership, Rea will be jointly and severally liable to Newell for that judgment. *Duggins v. Guardianship of Washington ex rel. Huntley*, 632 So. 2d 420, 429 (Miss. 1993). But it appears Karsten failed to take into account Mississippi Code Section 79-13-307, entitled, "Actions by and against partnership and partners[,]" which states that "a judgment against a partnership is not by itself a judgment against a partner. A judgment against a partnership may not be satisfied from a partner's assets unless there is also a judgment against the partner." Miss. Code Ann § 79-13-307(c)

9

(Rev. 2013). While Rea may be jointly and severally liable to the Partnership, she is not jointly and severally liable to Newell since he did not personally name her as a defendant in the underlying litigation.

¶17.    Karsten cites *Duggins* for the premise that a partner will be held vicariously liable to the judgment creditor for the acts or omissions of another partner acting within the scope of the partnership. Duggins was an attorney who represented a guardianship in a medical malpractice suit and associated another attorney with more experience in the field of medical malpractice to assist him. *Duggins*, 632 So. 2d at 422-23. The associated attorney, Barfield, was disbarred and pled guilty to misappropriation of guardianship funds in connection with the case. *Id.* at 425. The chancellor found—and this Court affirmed—that Duggins could be held vicariously liable to the guardianship for Barfield's actions since they were within the scope of the partnership. *Id.* at 426, 431. But this case lacks precedential value on this particular point because *Duggins* was decided in 1993, prior to the Mississippi legislature's adoption of the Uniform Partnership Act of 1997, effective January 1, 2005, which governs partnerships in Mississippi. *See* S.B. 2504, Reg. Sess., 2004 Miss. Laws ch. 458. The Court in *Duggins* relied on a previous version of the Uniform Partnership Act that did not include the language of Section 79-13-307(c) requiring a plaintiff to name the partner individually to satisfy a judgment against the partnership from the partner's personal assets. *See* Mississippi Code Section 79-13-307(c) (Rev. 2013). Nor did it include the language that the "partnership is an entity distinct from its partners" now found in Mississippi Code Section 79-13-201(a) (Rev. 2013).  In addition, unlike Rea in the present case, Duggins was actually

10

named as a defendant to the lawsuit filed by the guardianship. ***Duggins***, 632 So. 2d at 422. The issue is not whether Rea is jointly and severally liable for the partnership obligations—which may be the case under Section 79-13-306(a) and the amended partnership agreement—but that Rea is *not* personally liable to a judgment creditor for a judgment against the Partnership unless she is personally named in the lawsuit. *See* Miss. Code Ann. § 79-13-307(c). Therefore, by not naming Rea as a defendant in the underlying litigation, Newell will be unable to satisfy a judgment against the Partnership from Rea's personal assets. The proper avenue to hold Rea personally liable in the event Newell receives a favorable judgment would be an action by Karsten or the Partnership against Rea for contribution.

¶18.    In ***Barrett v. Jones, Funderburg, Sessums, Peterson & Lee, LLC***, 27 So. 3d 363, 372-73 (Miss. 2009) (citations omitted),[5] this Court stated:

> A litigant may sue a joint venture "in the name of the partnership" or he may bring an action against "any or all of the partners in the same action or in separate actions." However, a judgment against a partnership may not be satisfied from a partner's assets unless there is also a judgment against the individual partner.

The plaintiffs in ***Barrett*** named the individual coventurers in a joint venture as defendants in an effort to reach their personal assets to satisfy any judgment against the joint venture itself and the named coventurers. This Court noted that this was a "litigation strategy encouraged by Mississippi Code Section 79-13-307(c)." ***Id.*** at 373. Without being personally

---

[5]This Court has stated that a joint venture is a single-purpose partnership and is therefore governed by Mississippi's partnership law, the Uniform Partnership Act of 1997. ***Barrett***, 27 So. 3d at 372 (citing ***Duggins***, 632 So. 2d at 427).

named as a defendant in the underlying litigation or being subject to personal liability to Newell, there is no basis for finding an implied attorney-client relationship arose between Lawson and Rea.

¶19. The representation of a general partnership by an attorney does not automatically give rise to an attorney-client relationship between the attorney and any of the individual partners. Section 79-13-201(a) states that "a partnership is an entity distinct from its partners." This Court has not spoken directly to the issue; however, other jurisdictions and the American Bar Association that considered this very question have ruled that the representation of an individual partner does not automatically arise from the representation of a partnership entity. *See Vanderschaaf v. Bishara*, No. M2017-004120-COA-R3-CV, 2018 WL 4677455 (Tenn. Ct. App. Sept. 28, 2018) (concluding "that the attorney represented the partnership, not the individual partners"); *In re Conduct of Brown*, 956 P.2d 188 (Or. 1998) (stating "that the mere fact that a lawyer represents a partnership does not *ipso facto* make that lawyer the legal counsel to the individual members of the partnership or create a fiduciary relationship that flows to those individuals"); ABA Comm. on Ethics & Pro. Resp., Formal Op. 91-361 (1991) (finding "that a lawyer who represents a partnership represents the entity rather than the individual partners unless the specific circumstances show otherwise"); *Chaiken v. Lewis*, 754 So. 2d 118, 118 (Fla. Dist. Ct. App. 2000) (holding "that counsel for a partnership represents the partnership entity, but does not thereby become counsel for each partner individually" was a correct jury instruction); *Responsible Citizens v. Superior Ct.*, 20 Cal. Rptr. 2d 756, 764-65 (Cal. Ct. App. 1993) (holding that "representation of a partnership does

not, by itself, create an attorney-client relationship with the individual partners").

¶20.    In its Formal Ethics Opinion 91-361, the ABA listed factors to consider in an analysis of whether an attorney for a partnership has "affirmatively assumed a duty of representation to the individual partner[.]" ABA Comm. on Ethics & Pro. Resp., Formal Op. 91-361. Those factors included:

> whether the partner was separately represented by other counsel when the partnership was created or in connection with its affairs, whether the lawyer had represented an individual partner before undertaking to represent the partnership, and whether there was evidence of reliance by the individual partner on the lawyer as his or her separate counsel, or of the partner's expectation of personal representation.

*Id*. In the present case, Rea had no expectation of representation by Lawson or any other attorney. Rea did not act in reliance upon a presumption of representation by Lawson or any other attorney in the underlying litigation. Rea uniformly denied an attorney-client relationship existed between herself and Lawson in regards to the underlying litigation. This fact distinguishes and strengthens Pettis's case because it is the client's manifestation of an intent to be represented—not the attorney's intent to represent—that is determinative in the creation of the attorney-client relationship. *See Gibson*, 186 So. 3d at 848.

### C.    Even if Rea had been a represented person, Pettis did not violate Rule 4.2 in his communications with her.

¶21.    Even if an attorney-client relationship had arisen between Rea and Lawson, the chancery court erred by disqualifying Pettis because there was no evidence concerning the knowledge and subject matter requirements of Rule 4.2 of the Mississippi Rules of Professional Conduct. Rule 4.2 states that "[i]n representing a client, a lawyer shall not

communicate about the *subject of the representation* with a party the lawyer *knows to be represented* by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." Miss. R. Pro. Conduct 4.2 (emphasis added). The comment to Rule 4.2 specifically states that the rule does not bar communications with a party "concerning matters outside the representation." Miss. R. Pro. Conduct 4.2 cmt. The only finding the chancery court made was that "[Rea] is no longer a partner of the partnership but was a partner when Plaintiff's Complaint was filed in 2012[,] . . . that Penny Lawson represented the general partnership and its individual members," and that Pettis "violated the Rules of Mississippi Professional Conduct by conducting meetings with [Rea], a represented person."

¶22.    Pettis and Rea submitted sworn affidavits stating that Rea was unrepresented in connection with the underlying litigation and that they only discussed the issues surrounding Karsten's attempted sale of corporate land, a matter not pertaining to the subject of the alleged representation.[6] Karsten argues that the knowledge Rea was a represented person should be imputed to Pettis because of his association as Hester's law partner, without showing any actual or constructive knowledge held by Hester and despite Rea's own statements to Pettis on two separate occasions that she was not represented. Karsten points to an interrogatory directed toward the Partnership requesting the names of the partners as evidence that Hester—and by extension, Pettis—knew Rea was a represented person because

---

[6] Presuming that Rea was represented in connection to the underlying litigation, that representation would be for her role as a partner in the Partnership, not as a shareholder in the Corporation.

14

he knew she was a partner in the Partnership. Knowledge of Rea's status as a partner, however, raises no presumption of representation by Lawson on Rea's individual behalf, since representation of a partnership does not automatically create an attorney-client relationship between the individual partners and the attorney for the partnership.

¶23. Prior to any meetings with Rea, Pettis sent a letter noticing the corporate meeting to take place on April 15, 2019, to Lawson "as counsel for Karsten Simrall," stating that "[b]ut for your representation of Karsten Simrall in the [underlying litigation], we would transmit this letter directly to Karsten Simrall . . . ." Pettis copied Rea and Newell on the letter without any reference to Lawson's alleged representation of Rea. Lawson gave no response indicating that she represented Rea prior to Pettis's delivering the minutes of the corporate meeting despite the letter sent by Pettis and a phone call with Rea on April 11, 2019, informing Lawson of the meetings. Without any notice from Lawson and in view of Rea's denial that she was represented, Pettis did not have had any knowledge of the alleged representation.

### D. The appearance of impropriety is insufficient to justify disqualification.

¶24. Pettis and Rea denied speaking about the subject of the alleged representation. In their affidavits, they stated that the purpose and topic of the meetings was to discuss Karsten's attempt to sell land belonging to the Corporation. It is undisputed that Rea was unrepresented with regard to the issues discussed between her and Pettis at the two meetings.[7] Karsten

---

[7]When Rea met with Pettis in April of 2019, she had been disassociated from the Partnership for two years. Therefore, Rea was not a partner in the Partnership when she met with Pettis in 2019. Further, under Mississippi Code Section 79-13-702, at the time Rea met

argues, however, that the meetings created an appearance of impropriety because Lawson had recently met with Rea to prepare for the trial of the underlying litigation.

¶25.    The appearance of impropriety, standing alone, is an insufficient ground on which to base a disqualification. This Court has not spoken directly to this issue with regard to attorney disqualification. Mississippi case law dealing with the appearance of impropriety mainly pertains to judicial disqualification and allows for disqualification based solely on the appearance of impropriety. *See **Dodson v. Singing River Hosp. Sys.**,* 839 So. 2d 530, 534 (Miss. 2003) ("We must be vigilant to avoid the *appearance* of impropriety in any and all of our proceedings as judges.") Judicial conduct is significantly different in this regard because we presume the impartiality of our judges. ***Id.*** at 533. But we expect advocacy from our attorneys. Looking to other jurisdictions reveals a trend away from the appearance of impropriety test and towards a more substantial showing of misconduct in order to justify disqualification of one's chosen counsel. *See **Fed. Deposit Ins. Corp.**,* 50 F.3d at 1316 ("[W]e have held that disqualification is unjustified without at least a reasonable possibility that some identifiable impropriety actually occurred." (citing ***Woods v. Covington Cnty. Bank***, 537 F.2d 804 (5th Cir. 1976))); ***Ark. Valley State Bank v. Phillips***, 171 P.3d 899, 910 (Okla. 2007) ("Because the right to employ the counsel of one's choice is fundamental and a disqualification order is a drastic measure, the 'appearance of impropriety' test is an insufficient basis for a disqualification order."); ***DCH Health Serv. Corp. v. Waite***, 115 Cal. Rptr. 2d 847, 851 (Cal. Ct. App. 2002) ("The trial court abused its discretion in disqualifying

with Pettis, she was unable to bind the Partnership by her acts or omissions since she had been disassociated for more than a year. *See* Miss. Code Ann. 79-13-702 (Rev. 2013).

[the attorney] based solely on what is considered to be an appearance of impropriety."); ***L.D. v. Seymour***, 577 F. Supp. 3d 85, 89 (N.D.N.Y. 2022) ("The appearance of impropriety, standing alone, is insufficient to grant a motion to disqualify." (quoting ***Hickman v. Burlington Bio-Med. Corp.***, 371 F.Supp. 2d 225, 229 (E.D.N.Y. 1996))). This Court agrees and finds that a more substantial showing than the appearance of impropriety is required to justify an order for the disqualification of one's chosen counsel.

### II. The chancery court lacked subject matter jurisdiction and authority under these facts to preemptively disqualify Pettis.

¶26.    Pettis argues that the chancery court lacked subject matter jurisdiction to disqualify him for two reasons: Pettis was not practicing before the court, and the court lacked the authority to impose such a punishment. This Court has held that "all courts possess the inherent authority to control *the proceedings before them* including the conduct of the participants." ***Aeroglide Corp. v. Whitehead***, 433 So. 2d 952, 953 (Miss. 1983) (emphasis added). ***In re Sanction of Knott v. State***, attorney Sanford Knott was hired by Kenneth Tornes "to draft a will, draft a power of attorney, obtain his antique pickup truck from the Jackson Police Department, and to collect and disburse his retirement funds."*In re Sanction of Knott v. State*, 731 So. 2d 573, 575 (Miss. 1999). Knott carried out his duties to Tornes, but in doing so, the district attorney learned of the representation and filed a Motion for Review of Indigency in a criminal case that Tornes was facing alleging that Tornes had misrepresented his indigency. *Id.* A hearing was held regarding Knott's liability in assisting Tornes by obtaining and safeguarding his assets. *Id.* The trial judge made a finding that "as an officer of the court[, Knott] was always under the jurisdiction and control of the court."

*Id.* at 576. On appeal, this Court held that "the trial court [did] not have subject matter jurisdiction to discipline an attorney for misconduct in matters which [were] not before the court." *Id.* (citing *Danzig v. Danzig*, 904 P.2d 312 (Wash. Ct. App. 1995)). This Court also stated that

> any misconduct on the part of Mr. Knott arose from an engagement which was separate and distinct from the action which was pending before the circuit court. . . . The services Mr. Knott provided to Tornes did not constitute "practices and proceedings" before the trial court. Therefore, we find that the trial court exceeded its jurisdictional authority by disciplining Mr. Knott for alleged ethical misconduct.

*Id.* at 577. Without conducting practices and proceedings before the chancery court, the preemptive disqualification of Pettis was not within the subject matter jurisdiction of the chancellor.

¶27.    Pettis also argues that the chancery court lacked any authority whatsoever to disqualify him because such authority lies only with this Court. Pettis cites *Byers v. Turner*, in which the Court of Appeals found that the trial court had exceeded its authority by punitively sanctioning Byers for violating a rule of professional conduct. *Byers v. Turner*, 189 So. 3d 1281, 1284 (Miss. Ct. App. 2016). But the appellee in *Byers* failed to submit a brief on appeal, effectively serving as a confession of the errors made by the trial court alleged by Byers. *Id.* at 1283. In *Donaldson v. Cotton*, this Court stated that it "recogniz[ed] and endors[ed] a trial judge's duty to control the courtroom, using reasonable measures to efficiently move matters along[.]" *Donaldson v. Cotton*, 336 So. 3d 1099, 1106 (Miss. 2022) (alterations in original) (internal quotation marks omitted) (quoting *In re Blake*, 912 So. 2d 907, 914 (Miss. 2005)).

18

¶28. In ***Donaldson***, this Court affirmed a trial court's contempt order against a county prosecutor for the failure to prepare youth court orders. ***Id.*** at 1106. This Court reasoned that "drafting orders for judges is an ordinary professional activity that lawyers routinely discharge in practice." ***Id.*** While the Court's opinion in ***Donaldson*** demonstrates the authority of a trial court to control the proceedings before it, its reasoning does not extend to Pettis's actions under these facts. Karsten argues that the chancellor's order granting the motion to disqualify Pettis in the instant case is like the trial judge's contempt order in ***Donaldson***. But unlike the county prosecutor, Pettis was not acting in a matter before the court, nor was he discharging a duty that is routinely practiced before the court. Pettis met with Rea in his office about corporate matters and attended corporate meetings and the election of a new board of directors on behalf of his client, Newell. Therefore, the court's authority does not extend under the reasoning of ***Donaldson*** to Pettis's actions in the present case.

¶29. Although not explicitly argued by the parties, as Hester's law partner, Pettis's disqualification does not fall under Rule 1.10 of the Mississippi Rules of Professional Conduct as an imputed disqualification of a law firm due to a conflict of interest because the chancellor only made a finding that Pettis violated Mississippi Rule of Professional Conduct 4.2, not that a conflict of interest existed. Hester's disqualification was within the jurisdiction and authority of the chancery court because he was engaged in practices and proceedings before the court as Newell's attorney in the underlying litigation. Because Rea was not a party to the underlying litigation and because Pettis did not represent Newell in the litigation,

19

no conflict of interest existed. Therefore, this Court finds the disqualification of Pettis under the theory of an imputed disqualification as a member of Hester's law firm to be untenable.

## CONCLUSION

¶30. This Court finds no attorney-client relationship between an attorney and a partner in a general partnership can be implied simply from an attorney's representation of the general partnership. Furthermore, a chancellor may not preemptively disqualify an attorney for practices and proceedings that were not before the court. This Court finds that the chancery court erred by entering an order to disqualify Pettis since no attorney-client relationship existed, Pettis did not violate Rule 4.2 of the Mississippi Rules of Professional Conduct, and the chancellor lacked the subject matter jurisdiction and authority under these facts to disqualify Pettis. This Court reverses the chancery court's order, renders a judgment in favor of Pettis and remands for further proceedings.

¶31. **REVERSED, RENDERED AND REMANDED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, BEAM, ISHEE AND GRIFFIS, JJ., CONCUR.**